**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ONE THREE FIVE, INC. t/d/b/a BLUSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-467 |
| | ) | Judge Nora Barry Fischer |
| CITY OF PITTSBURGH, ACTING CHIEF | ) | |
| OF POLICE REGINA MCDONALD, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**I.  INTRODUCTION**

In this case, Plaintiff One Three Five, Inc. t/d/b/a Blush ("Plaintiff"), an adult entertainment establishment in downtown Pittsburgh featuring nude, erotic dancing, alleges that its federal constitutional rights to freedom of speech, procedural due process and equal protection of the laws and its Pennsylvania constitutional right to freedom of speech have been violated by the recent decision by Defendant Acting Chief of Police Regina McDonald ("Acting Chief McDonald") revoking Blush's status as an approved secondary employer under the Bureau of Police's Secondary Employment Program and preventing City of Pittsburgh Bureau of Police officers from working off-duty secondary employment details at adult establishments.  (Docket No. 1-1).  Plaintiff has moved for a temporary restraining order or, alternatively, a preliminary injunction to enjoin Defendants, the City of Pittsburgh ("the City") and Acting Chief McDonald from enforcing this directive.  (Docket Nos. 3, 4, 5, 25-26).  Defendants oppose both motions and contend that Acting Chief McDonald's directive was made to enforce an alleged long-standing restriction on the ability of City police officers to engage in secondary employment at

locations that may tend to bring the Bureau into disrepute.[1]  (Docket No. 8, 9, 23-24).  However, Defendants admit that the policy has never been enforced in the manner that was taken by Acting Chief McDonald.  (*Id.*).

The Court held a motion hearing on April 25, 2013 during which the parties presented witness testimony and documentary evidence for the Court's consideration and the evidentiary record has now closed.  (*See* Docket No. 22; Pl. Ex. 1-3; Def. Ex. B-D).  The parties have since filed proposed findings of fact and conclusions of law with respect to the requested temporary restraining order and/or preliminary injunction.  (*See* Docket Nos. 23-27).  Upon consideration of the present evidentiary record and all of the parties' arguments, the Court finds that Plaintiff has met its burden to establish that the issuance of preliminary injunctive relief is appropriate in this case and Plaintiff's Motion [3] will be granted.  The Court now turns to its explanation of this decision.

## II.  FINDINGS OF FACT[2]

At the April 25, 2013 hearing, the Court accepted testimony from: Albert Bortz, proprietor of Blush; Anna West, head bartender at Blush; Officer Bernard Joseph McMullan of the City of Pittsburgh Bureau of Police, who also worked secondary employment details at Blush; Sabrina Bortz, payroll manager at Blush; Lieutenant Jennifer Ford of the City of Pittsburgh Bureau of Police; Acting Chief McDonald; and Sergeant Michael LaPorte of the City of Pittsburgh Bureau of Police and President of the Fraternal Order of Police Fort Pitt Lodge No. 1 ("FOP").[3]  (Docket No. 22).  The Court found all of the witnesses to be generally credible and

---

[1]      Defendants have also filed a motion to dismiss and/or summary judgment wherein they seek dismissal of Plaintiff's claims or judgment entered in their favor.  (Docket Nos. 13, 21).  Defendant opposes same.  (Docket No. 16).  The Court will issue a separate Memorandum Order addressing these motions.

[2]      "A court considering whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing, and base its decisions on credibility determinations."  *Hudson Global Resources Holdings, Inc. v. Hill,* Civ. A. No. 07-132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

[3]      The FOP is the local police union and its members are City of Pittsburgh Bureau of Police officers.  *See* Pl.

truthful throughout their respective testimonies. The parties also submitted all of the following documents into evidence: Order 29-1 (Pl. Ex. 1); Arbitration Award (Pl. Ex. 2); Deposition of Regina McDonald (Pl. Ex. 3); IACP Model Policy on Secondary Employment (Def. Ex. B); Pittsburgh Post-Gazette article "Special events office channels millions in off-duty Pittsburgh Police pay" dated 2/26/13 (Def. Ex. C); and a Triblive article "Pittsburgh policies for off-duty police officers' gigs lax" dated March 11, 2013 (Def. Ex. D).[4]

The Court holds that the credible evidence presented during the hearing established the following facts by a preponderance of the evidence.

### A. Historical Background of Bureau's Governance of Off-Duty Conduct of Officers

The parties agree that the City of Pittsburgh Bureau of Police and the Acting Chief of Police have the authority to create and enforce policies governing the off-duty conduct of City of Pittsburgh police officers. (Docket No. 22 at 203-04). Indeed, they have stipulated that police departments have the authority to discipline officers for off-duty conduct, including for engaging in conduct unbecoming an officer and that there are policies, procedures and guidelines that are adopted by any police department that provide for discipline of an officer based on his or her engaging in certain improprieties while off-duty. (*Id.*). However, the regulation of officers' off-duty conduct by the Bureau and Chief are issues that have been subject to collective bargaining and arbitration between the Bureau and the FOP. (*See* Pl. Ex. 2; Docket No. 10-1).

Acting Chief McDonald testified that the Bureau has historically permitted its officers to engage in off-duty secondary employment "details" within the City limits wherein officers essentially provide security services to private businesses while wearing their full police uniform

---

Ex. 2; Docket No. 22 at 193. The FOP represents City police officers in collective bargaining matters with the City of Pittsburgh. *Id.*

[4]    The Court sustained the Plaintiff's objections to Defendants' introduction of a series of police reports into evidence, marked as Def. Ex. A, for reasons stated in an Order entered on May 23, 2013. (Docket No. 28).

and carrying their Bureau-issued weapons in exchange for a fee paid by the private business to the City and for wages paid by the private business to the individual officer working in this capacity. (Docket No. 22 at 151). In these roles, officers are authorized to enforce City ordinances and laws, as if they were on-duty. (*Id.*). Due to jurisdictional limitations on the scope of the arrest powers afforded to law enforcement officers in other municipalities and other conflicts which are not directly relevant here,[5] it is undisputed that City of Pittsburgh police officers are the *only* law enforcement officers who could provide the same type of service to a business located within the City limits. (*Id.* at 181, 185).

### B. *Bureau's Policy-Making Practices and Procedures*

The record evidence before the Court demonstrates that such off-duty details by police officers have been permitted by the Bureau since at least 1966. (*Id.* at 17, 151). For many years the practice was permitted by the Bureau without a written policy governing same.[6] (*Id.* at 151). As is discussed in further detail below, over time, the Bureau developed a policy governing the off-duty employment of its officers. Lieutenant Ford, Acting Chief McDonald and Sergeant LaPorte testified consistently concerning the procedures employed by the Bureau to establish a new policy or revise a current policy. (Docket No. 22 at 99, 123, 175, 193-95). Lieutenant Ford was familiar with these procedures as she has held a position overseeing policy writing within the Bureau since 2004. (*Id.* at 99, 123). Acting Chief McDonald likewise testified that she was

---

[5]       The record evidence presently before the Court suggests that State Police Troopers and Allegheny County Deputy Sheriffs are not permitted to engage in this type of off-duty secondary employment details due to the internal policies of those agencies barring such activities. (Docket No. 22 at 181, 185). In addition, the testimony established that the City generally accepts liability for claims made against officers arising from arrests and other incidents taking place during the secondary employment details. (*Id.* at 181-82). The City is self-insured for such claims. (*Id.* at 182). Further, if an officer is injured while performing secondary employment duties, he or she is generally entitled to Heart and Lung or Workers Compensation benefits under the City's policies. (*Id.* at 196).

[6]       Although not directly relevant here, the testimony established that initially there was also no office or section of the Bureau which provided direct oversight over the off-duty employment of officers. (Docket No. 22 at 151). It appears that, at most, individual commanders provided such oversight of the off-duty work of the officers assigned to them. (*Id.*). The Special Events and Cost Recovery Office ("Special Events") presently provides some oversight of the program, particularly with respect to the collection of fees from secondary employers and scheduling issues. (*Id.* at 122, 175-76; Pl. Ex. 1 at §§ 3.2.1; 3.4; 7.4; 8).

familiar with the procedures for policy writing given her prior roles on a labor-management committee and as Assistant Chief for Administration for which her duties included oversight of the Special Events Office. (*Id.* at 175). Sergeant LaPorte also had some involvement with the review of Bureau policies given his role as President of the FOP. (*Id.* at 193-95).

The Bureau uses its internal staff to draft new policies and revise its current policies. (*Id.* at 99). The initial request to draft or revise a policy is usually made by the Chief of Police or one of the higher Commanders in the Bureau to Lieutenant Ford and/or an officer who assists her in drafting the policies. (*Id.*). The Bureau maintains a "bank" of model policies which are referenced for guidance and used as a base to develop the new or revised policy. (*Id.*). The primary set of model policies that is maintained by the Bureau is produced by the International Association of Chiefs of Police ("IACP") National Law Enforcement Policy Center. (*Id.*; Def. Ex. B). Lieutenant Ford testified that this organization has a model policy writing center and that the model policies it produces may be used by any police department in drafting policies. (*Id.* at 101). She explained that the IACP model policies are often accompanied by white papers or research detailing the reasons for the language incorporated into the suggested model policy. (*Id.* at 101-02). She also understands that the IACP model policies are considered best practices for law enforcement agencies and are widely used by other police departments in developing policies. (*Id.* at 102). In addition to using the model policies, the officers tasked with drafting the policy will often meet with the higher level officers who requested the new policy or revision and/or with any officers who are considered experts on the subject matter of the policy and will incorporate their suggestions into the policy. (*Id.* at 100). On occasion, the officers may secure a legal opinion concerning a policy from the City's Legal Department. (*Id.* at 123).

The first draft of a policy is prepared by Lieutenant Ford or another officer working with

her. (*Id.* at 100). It is then sent for an initial level of review to the command staff, which consists of the Chiefs and Commanders of the Bureau, and to a set of police supervisors who have been asked to review policies. (*Id.* at 100). This initial review period typically lasts about a week. (*Id.* at 101). Lieutenant Ford testified that any comments, suggestions or concerns regarding the policy which are made during this level of review are typically incorporated into the policy. (*Id.*). After any necessary revisions are made, the policy is then sent to the FOP for its review. (*Id.*). Under the collective bargaining agreement ("CBA")[7] between the City and the FOP, the FOP is granted fifteen (15) days to consider the proposed policy and to respond with comments, suggestions or concerns as to same. (*Id.*). The officers will consider any response from the FOP and incorporate any necessary revisions into the policy. (*Id.*). After all changes are made, the final version of the proposed policy is sent to the Chief of Police for approval. (*Id.*). Once it is signed by the Chief, it becomes the policy of the Bureau. However, upon approval by the Chief, the policy is generally not released to the public. (Docket No. 22 at 122, 129-30).

Lieutenant Ford and Acting Chief McDonald offered some general testimony concerning the Bureau's early development of a formal, written policy governing secondary employment of City police officers. (*Id.* at 103-04, 151-52). They recalled that the first version of the policy was developed during the tenure of former Chief of Police Robert McNeilly and may have been implemented in the early 2000s. (*Id.*). Neither remembered being personally involved in the drafting of the initial policy at that time and the prior version of the policy was not presented to the Court during the proceedings. (*Id.* at 103).

### C. IACP Model Policy on Secondary Employment

---

[7] The Court notes that the CBA is the active agreement between the City and the FOP governing work-related matters concerning the City's employment of City police officers. *See* Pl. Exs. 1, 2.

Defendants offered IACP Model Policy on Secondary Employment dated October 1996 and said model policy was admitted into evidence, with the Court reserving its ruling on the weight, if any, to be given to same. Def. Ex. B. Defendants did not present any evidence which confirmed that the IACP Model Policy was used by the Bureau to develop its own secondary employment policy and their witnesses were unaware if the IACP Model Policy was even referenced during that process. The IACP Model Policy is not identical to the Bureau's Order 29-1, which is at issue in this case, but is similar in some respects. Def. Ex. B. From the Court's view, the major difference between the IACP Model Policy and Order 29-1 is that the IACP Model Policy regulates only the conduct of the police officers and thereby contains no provisions which define a secondary employer, describe the process for a secondary employer to participate in the program, grant the authority to approve or disapprove of such an application to the chief of police or some other regulatory body, or set forth any guidelines for the revocation of secondary employer status. *Compare* Def. Ex. B; Pl. Ex. 1.

The nomenclature used by the IACP Model Policy is also different. To this end, the IACP Model Policy distinguishes between "extra-duty employment" and "regular off-duty employment" and provides guidelines for law enforcement personnel engaged in these types of secondary employment. Def. Ex. B. at § III. "Extra-duty employment" is defined as "employment that is conditioned on the actual or potential use of law enforcement powers by the police officer employee." *Id.* The policy further states that police officers may engage in "extra-duty employment" in a number of situations including "security and protection of life and property." *Id.* at § IV.B.2.c. "Regular off-duty employment" is defined as "employment that will not require the use or potential use of law enforcement powers by the off-duty employee." *Id.* at § III. This type of employment is permissible if it does not present a conflict of interest

between the duties of the law enforcement officer and the secondary employer and the Model Policy provides examples of potential conflicts. *Id.* at § IV.A.2. It also states the following with respect to "regular off-duty employment":

> 3. Employment that does not constitute a threat to the status or dignity of law enforcement as a professional occupation. Examples of employment that constitute such a threat and should be denied include, but are not limited to:
>     a. Establishments that sell pornographic books or magazines, sexual devices or videos, or that otherwise provide entertainment or services of a sexual nature.
>     b. Any employment involving the sale, manufacture, or transport of alcoholic beverages as the principal business.
>     c. Any gambling establishment.

*Id.* at § IV.A.3. The IACP Model Policy suggests that law enforcement agencies place some limitations on regular off-duty employment and extra-duty employment which focus on the eligibility of the officer, the number of hours that may be worked, scheduling concerns and prioritizes such outside work below regular police duties of the officers. *Id.* at § IV.C. The IACP Model Policy concludes that "[p]ermission for a police employee to engage in outside employment may be revoked where it is determined pursuant to agency procedure that such outside employment is not in the best interests of the agency." *Id.* at § IV.C.7.

    *D. Arbitration Award and CBA*

The earliest evidence of the Bureau's formal policy governing secondary employment of its officers in the present record is an Arbitration Award in Case No. 55 360 L 00341 04 between the City and FOP from a hearing dated June 9, 2006. Pl. Ex. 2. The Arbitration Award details certain terms and conditions of the secondary employment program vis-à-vis the Bureau and City police officers which would govern the parties' relationship going forward. *Id.* Sergeant LaPorte testified that the terms and conditions of Section A, paragraphs 1-14, of the Arbitration

Award were directly copied by the City's lawyers into the CBA between the City of Pittsburgh and the FOP. (Docket No. 22 at 201). Indeed, the Court agrees that several of the paragraphs in the Arbitration Award are identical to the portion of § 24 of the CBA which was also presented by Defendants for the Court's consideration. (*See* Docket No. 10-1).

The Arbitration Award and CBA contain a similar provision which is relevant to this case, and provides that "[t]he City may enact reasonable rules and regulations to govern the secondary employment of police personnel, including but not limited to … **limitations on who may be an approved Secondary Employer.**" (Docket No. 10-1 at ¶ 4; Pl. Ex. 2 at § A.4 (emphasis added)). Thus, pursuant to this language, the City is granted the discretion to set limitations on entities that may be approved as secondary employers under the program and apparently may do so without seeking the input of the FOP. *Id.* The remainder of the provisions of the Arbitration Award and CBA set forth the parameters of the secondary employer program as it relates to the duties and responsibilities of the City and its police force. To this end, both the Arbitration Award and CBA emphasize that police officers are "first and foremost police officers or police supervisors of the City," that officers must avoid conflicts between their regular duties and secondary employment, and that officers are voluntary participants in all secondary employment work. (*Id.* at ¶¶ 1, 2). The documents also explain, among other things, that the hours worked by City police officers in secondary employment positions do not constitute overtime hours as city employees and that officers are paid rates for off-duty jobs pursuant to any agreements between the City and the Secondary Employer. (*Id.* at ¶ 3).

*E. Order 29-1*

The Pittsburgh Bureau of Police has enacted Order 29-1, an internal, non-public, Bureau policy the purpose of which "is to set forth guidelines to govern the secondary employment by

members of the Pittsburgh Bureau of Police." (Pl. Ex. 1). Former Chief of Police Nate Harper

signed the current version of Order 29-1, which has an effective date of April 16, 2007. (*Id.*).

Order 29-1 stresses that City police officers "must recognize that their primary duty, obligation

and responsibilities are to the Pittsburgh Bureau of Police," that police work takes precedence

over secondary and outside employment, including emergency situations, special assignments or

extra duty, that conflicts of interest must be avoided and that while secondary employment is

permissible, it is subject to the terms and conditions of Order 29-1 and any such off-duty work

by the officers must be approved by the Bureau. (*Id.* at §§ 1.2, 3.0, 4.1, 6.0). In addition, the

policy states that officers "will conduct themselves as though they were on-duty, and will be

subject to all departmental rules, regulations, policies and procedures set forth by the Pittsburgh

Bureau of Police while engaged in a secondary employment capacity." (*Id.* at § 4.1). Section

2.0 defines a number of terms of the policy, including:

> 2.1 **Secondary Employment** – Any employment of a member by a
> private entity that is conditioned on the actual or potential use of
> law enforcement powers by the police officer employee.
>
> 2.2 **Outside Employment** – Any employment of a member by a
> private entity that will not require the use or potential use of law
> enforcement powers by the off-duty employee.
>
> 2.3 **Secondary Employer** – A private entity that employs a
> member conditioned on the actual or potential use of law
> enforcement powers by the police officer employee.
>
> …
>
> 2.9. **Detail** – The secondary employment opportunity. The word
> "detail" is interchangeable with the phrase "secondary employment
> opportunity."

(*Id.* at §§ 2.1, 2.2, 2.3, 2.9). Order 29-1 grants considerable authority to the Chief of Police to:

determine the eligibility of all city police officers for secondary employment details, (*Id.* at §

5.0); approve or disapprove of the type of secondary employment for which any officer engages, (*Id.* at § 3.1); regulate the number of hours any officer may work in these off-duty positions, (*Id.* at §§ 3.1, 13.0, 14.0); and approve or disapprove of any application by a potential secondary employer to participate in the hiring of city police officers for off-duty details, (*Id.* at § 7.2). The relevant provisions appear in the policy, as follows:

3.0 **Authority**

3.1 The Chief of Police or his/her designee shall have the authority to approve or disapprove the secondary employment of any member of the Bureau of Police.

…

3.3 The Chief of Police or his/her designee may regulate the type of employment and the hours a member may work.

…

4.0 **Accountability**

4.1 Members will conduct themselves as though they were on-duty, and will be subject to all departmental rules, regulations, policies and procedures set forth by the Pittsburgh Bureau of Police while engaged in a secondary employment capacity.

…

7.0 **Secondary Employer Obligations and Options**

7.1 The Secondary Employer must complete and submit a PBP Form #21.9.10, "Secondary Employment Agreement."

7.2 The "Secondary Employment Application Agreement" is reviewed, approved or disapproved by the Chief of Police or his/her designee.

7.3 Approved applicants are notified in writing of the approval of the "Secondary Employment Application Agreement." Obligations and options are presented.

7.4 Secondary Employers have three options when scheduling officers for a detail.

7.4.1. **Option 1** – The secondary employer can schedule officers

by utilizing the services of the Pittsburgh Bureau of Police, Office of Special Events and Cost Recovery (SECR).

…

        7.4.1.2.  The secondary employer will be billed for the officer(s) hourly rate and cost recovery at the end of each month. The Cost Recovery Fee ("CRF") is $3.85 per hour/per officer. Failure to pay this bill within thirty (30) days of receipt may result in the revocation of the secondary employer's approved status.

…

7.4.2.  **Option 2** – The secondary employer can schedule officers by utilizing the services of the Pittsburgh Bureau of Police, Officer of Special Events and Cost Recovery using a <u>preference list</u>.

…

        7.4.2.4.  The secondary employer will be billed for the officer(s) hourly rate and cost recovery at the end of each month. The Cost Recovery Fee ("CRF") for employers submitting a preference list is $3.85 per hour/per officer. Failure to pay this bill within thirty (30) days of receipt may result in the revocation of the secondary employer's approved status.

…

7.4.3.  Option 3 – An approved secondary employer that is not subject to special events or traffic obstruction permits may request to designate an active Pittsburgh Police officer to coordinate and schedule details.

…

        7.4.3.4.  The secondary employer has the option of having the detail officers paid through the Police Bureau's payroll system or electing to issue checks individually to the detail officers.

        ***(Note: the secondary employer must issue cash or checks directly to the detail officers or make payment through the Bureau's payroll system. It is prohibited to make payment through the scheduler or any other third party.)***

        7.4.3.5.  The secondary employer will be billed for cost recovery at the end of each month. The Cost Recovery Fee ("CRF") for secondary employers utilizing a scheduler is $3.85 per hour/per officer. Failure to pay the Cost Recovery Fee within thirty (30) days of receipt may result in the revocation of the secondary employer's approved status.

…

## 13.0 <u>Secondary Employment Limitations</u>

…

13.5 **With approval**, an officer may engage in secondary employment opportunities at establishments whose primary purpose is the selling and dispensing of alcoholic beverages under the following provisions:

> 13.5.1. Officers shall be in full uniform
>
> 13.5.2. Officers are not permitted to work inside the establishment, but may respond inside to handle any disturbances, crimes, etc., occurring in the establishment.
>
> 13.5.3 Officers are not permitted to "card" patrons
>
> 13.5.4. Officers may not search patrons prior to entry into the establishment. (This provision also prohibits the use of hand-held metal detectors for the purpose of scanning or searching customers for weapons.).

13.6 Officers may not work secondary employment at any location that may tend to bring the Bureau of Police into disrepute or that may reduce the efficiency or usefulness of the officer as a member of the Bureau of Police.

…

## 14.0 <u>Outside Employment</u>

14.1 Employees may engage in off-duty outside employment that will not require the use or potential use of law enforcement powers by the off-duty employee as long as the following requirements are met:

…

> 14.1.4 The employment does not constitute a threat to the status or dignity of the police as a professional occupation. Some examples of employment that present a threat to the status or dignity of the police profession include, but are not limited to:
>
> > 14.1.4.1 Establishments that sell pornographic books, magazines, sexual devices or videos or that otherwise provide entertainment or services of a sexual nature.
> >
> > 14.1.4.2. Any gaming establishment not exempted

by law.

**15.0 General Rules, Regulations & Guidelines**

…

15.5 Officers working secondary employment details will not enforce business rules or directions of the Secondary Employer.

..

15.13 All members who wish to work or schedule secondary employment opportunities shall adhere to the Bureau of Police Manual of Procedural Orders at all times while working secondary employment opportunities.

(Pl. Ex. 1 (emphases in original)).

All of the law enforcement witnesses who testified at the hearing confirmed that Order 29-1 distinguishes between "outside employment" and "secondary employment."  (Docket No. 22 at 119 (Ford); 149, 155-56 (McDonald); 194 (LaPorte)).  Sergeant LaPorte succinctly explained that an officer engaged in "outside employment" is working in a position which does not include the potential use of law enforcement powers by the officer, such as employment at Home Depot or Giant Eagle.  (Docket No. 22 at 194).  In contrast, officers working in a "secondary employment" capacity are dressed in their full City of Pittsburgh Bureau of Police uniform, possess their Bureau-issued weapons and are expected to make full use of their arrest powers, as necessary.  Pl. Ex. 1 at § 2.1.  The City's witnesses, Acting Chief McDonald and Lieutenant Ford, conceded that Section 14.0 of Order 29-1 only applied directly to "outside employment" although, as is discussed in more detail below, they opined that the language of Section 14.1.4 was relevant to their interpretation of the provisions governing "secondary employment" under Order 29-1.  (Docket No. 22 at 155-56).

The testimony at the hearing established that, consistent with Order 29-1, entities seeking

to become approved secondary employers are required to fill out an application and submit it to the Bureau. (Docket No. 22 at 122, 176). Acting Chief McDonald explained that the application constitutes an agreement between the Bureau and the secondary employer. (*Id.* at 176). Upon receipt, the entity's application is forwarded to the Chief of Police or his/her designee for a decision of whether to approve or disapprove of the application. (*Id.*). If the application is approved, the Bureau sends out a packet of information to the entity. (*Id.* at 123, 176). Although an information packet was not admitted into evidence, Acting Chief McDonald testified that it would include only a summary of the policies and procedures under Order 29-1 because the policy itself is not generally made available to the public or the secondary employers, even upon request. (*Id.* at 122, 176). She provided little detail about the information provided about the policy to the secondary employer but confirmed that the packet would at least include details concerning: the $3.85 per hour cost recovery fee due to the City; the amount of wages due to the officers working the details; and, the potential methods available to pay the officers working details. (*Id.* at 176).

Acting Chief McDonald testified that an application may be denied if the business of the entity seeking services constituted a conflict of interest with the Bureau or if accepting the business as a secondary employer would otherwise violate Order 29-1. (*Id.* at 162-63). As an example, she explained that she had recently denied an application for a security company that wished to hire officers in a secondary employment capacity. (*Id.*). She also testified that an entity's secondary employer status may be terminated if the entity failed to pay the necessary cost recovery fee. (*Id.*).

*F. Plaintiff's Establishment –Blush*

Plaintiff One Three Five, Inc. is owned by Albert Bortz and operates the Edison Hotel

and Blush in a commercial building located on 9th Street in the Cultural District of downtown Pittsburgh. (Docket No. 22 at 17-18, 37, 62). Plaintiff's operation of the Edison Hotel is not at issue in this litigation. With respect to Blush, the parties agree that Blush features adult entertainment consisting of nude, erotic dancing by its dancers and national acts. Aside from the nude dancing, the atmosphere at Blush is akin to a typical sports bar environment with numerous televisions, a disc jockey playing music and a cash bar. (*Id.* at 20, 49-50, 158). Bortz testified that he represents the third generation of his family to operate these types of businesses at that location and that his family has done so for approximately eighty (80) years. (*Id.* at 17). He further explained that he has personally worked at the businesses (and their predecessors) for almost forty-three (43) years. (*Id.*).

The main entry doors to Plaintiff's businesses are located on 9th Street. (*Id.* at 34, 55). These entry doors open into a lobby area which was recently renovated and consists of restrooms and two sets of internal doors that are used to access the different businesses, i.e., Blush and the Edison Hotel. (*Id.* at 34, 55, 60, 74). Acting Chief McDonald testified that the outdoor signage of the building is unremarkable and admitted that there are no bold signs on the building directly advertising Blush as a strip club or an adult business. (*Id.* at 161).

Bortz offered unrebutted testimony that Blush is an award-winning business, ranked as one of the top 100 adult-entertainment clubs in the country. (*Id.* at 25). Plaintiff's witnesses explained that Blush attracts steady business during the week but draws larger crowds when national acts perform on weekends and at times when large events are going on in the City. (*Id.* at 22-3, 25-6, 34). The patrons at Blush are diverse in age--ranging from college-aged individuals to older, professional businessmen and couples. (*Id.* at 19, 25-6, 53). The witnesses also advised that Blush's crowds on Friday and Saturday nights are generally more boisterous

because it is a recognizably younger audience and often includes bachelor and bachelorette parties, who tend to drink alcohol more heavily. (*Id.* at 20-1, 53). West testified that the larger, more aggressive crowds on the weekends are especially difficult to deal with in her role as head bartender. (*Id.* at 51-54).

In any event, Bortz testified that he operates a clean establishment, which has had no significant issues with criminal activity by patrons or otherwise. (Docket No. 22 at 25). The parties agree that Blush is not a nuisance bar and has recently had a disproportionately low number of criminal incidents at the site when compared to other locations within the City for the period of time from January of 2010 until the date of the hearing, including no reported criminal incidents from March 12, 2013 through April 25, 2013. (*Id.* at 77-8, 95). Blush does not hire bouncers or security guards to provide security. (*Id.* at 36). Instead, it relies on its floor managers and other staff to enforce its business rules and to report any criminal activity to the authorities, as necessary. (*Id.* at 50-1).

### G. Blush's Hiring of Off-Duty City Police Officers

Bortz testified that since 1966 his family has been supplementing their internal staff by hiring off-duty City police officers to work off-duty secondary employment details at their facilities. (Docket No. 22 at 17). More recently, Blush has typically hired an off-duty officer to work on weekend nights and on other dates which correspond to large events in the City given the increased number of patrons on those days and the greater need for crowd control. (*Id.* at 36). The officer hired by Blush is stationed outside the business on 9th Street from approximately 10:00 p.m. until 2:30 a.m. (*Id.* at 46, 68). Bortz explained that he hires an off-duty officer in order to deter crime both outside and inside his establishment. (*Id.* at 18). One of the problems his business faces outside the establishment are aggressive panhandlers that bother

his customers while entering and leaving the facility and when smoking outside. (*Id.* at 29-30). The main issues with crime inside Blush include theft of services and failure/refusal to pay for bar tabs. (*Id.* at 18, 66). Bortz stated that the presence of the off-duty officer on 9th Street also provides a deterrent to crime at other businesses in the Cultural District and thus additional security for members of the public who are out in that area. (*Id.* at 18-9, 23-4). Bortz and head bartender West believe that the off-duty officer is useful in many ways, including: preventing crimes from occurring inside the facility; dispersing crowds at the conclusion of the night; deterring aggressive panhandlers who bother customers and employees during and after business hours; and, providing security for its staff while they close the cash registers and return to their vehicles in an adjacent lot which is located across 9th street from the business. (*Id.* at 18-20, 48).

Bortz proclaimed that he chooses to hire City police officers rather than bouncers or security guards because of the superior level of service provided by the City police officers and the level of professionalism exhibited by the officers who have worked for his businesses in this capacity. (*Id.* at 18). He further testified that the presence of the officer insures that his business is secure and opined that the police presence makes his patrons more comfortable. (*Id.* at 18-9). He believes that the officer's presence on the weekends also deters crime during the week because potential criminals know that the officers are often stationed there but do not know when/if they are there on any given night. (*Id.*). Head bartender West agreed that the officer provides peace of mind that she and the other staff members are safe while working and later, when they return to their vehicles at the conclusion of a shift. (*Id.* at 48).

### H. Blush's Status as an Approved Secondary Employer and Activities Under the Program

Since at least 2007, Blush has been an approved secondary employer under the Bureau's Secondary Employer Program. (*Id.* at 31). Bortz testified that he filled out application forms

and submitted them to the City for approval and that his business was always approved. (*Id.*). (The actual forms were not admitted into evidence). In exchange for the services performed by the officers, Blush pays the officer working the detail wages (time and a half) and also pays the City a cost recovery fee, which is presently $3.85 per hour. (*Id.* at 37, 83-4, 87-8, 167-68). It is undisputed that Blush has always timely paid the applicable cost recovery fee to the City and any wages due to the officers working secondary employment details. (*Id.* at 86). Bortz explained that he has never had any issues with the City concerning the participation of his businesses in the secondary employer program. (*Id.* at 33). Indeed, Acting Chief McDonald conceded that Blush had been approved as a secondary employer for many years by past Chiefs of Police, including her immediate predecessor Nate Harper. (*Id.* at 149-150). She also told the Court that Blush's application was most recently approved in November of 2012, when the Bureau updated its records and required that all secondary employers submit updated applications in order to continue to participate in the program. (*Id.* at 176-77).

Officer Bernard Joseph McMullan is a 19-year veteran of the City of Pittsburgh Bureau of Police. (*Id.* at 24). He testified that he has worked a secondary employment detail at Blush since 1997. (*Id.*). His father was also a City police officer and worked the detail at Blush for a number of years prior to his assuming that duty. (*Id.* at 33, 59). Officer McMullan testified that the City always remains his primary employer, although he punches a clock at Blush to record his time and is paid directly by Plaintiff for his services. (*Id.* at 74-5). He explained that he is not subject to the business rules of Plaintiff but is required to abide by the policies and procedures of the City set forth in Order 29-1 at all times. (*Id.* at 64-5). Officer McMullan offered credible and unrebutted testimony that he performed his secondary employment duties at Blush consistently with the Bureau's policies and procedures and that he has never been

requested to do anything inappropriate by Plaintiff's staff.[8] (*Id.* at 63-5, 74). In this regard, he generally remains stationed at his post outside the building on 9th Street unless called upon to assist with an alleged criminal incident inside. (*Id.* at 66-7, 74). On occasion, and often due to inclement weather, Officer McMullan will retreat his post inside the shared lobby area between Blush and the Edison Hotel for a period of time but he is never stationed inside Blush during the detail. (*Id.*).

Officer McMullan explained that his primary functions while working at Blush are to provide a police presence at the establishment and to respond to calls for police assistance from the business, as needed. (*Id.* at 59-60). He also helps to disperse the crowd after Blush closes at 2:00 a.m. and provides security while the staff cashes out registers and returns to their vehicles. Officer McMullan recounted that Blush has not had any significant criminal events take place during the dates and times that he worked there. (*Id.* at 60-1). He agreed that he has not had the need to request back-up support from on-duty police officers since January 2010, that Blush has not made any such calls directly to 911 while he was stationed there and that he has made no arrests during that time period from incidents occurring inside the facility. (*Id.* at 67). However, Officer McMullan testified that he has responded to calls for assistance from other business owners in the area while working the detail. (*Id.* at 61-62, 67, 71). Of note, in one instance, Officer McMullan responded to a general call on his radio that two armed robbers were located in the Cultural District. (*Id.* at 61-62). He made a positive identification of these armed individuals based on the description provided over the radio and was able to detain them. (*Id.*).

When asked whether he believed that his presence at Blush brought disrepute upon the Bureau, Officer McMullan emphatically responded "absolutely not." (*Id.* at 63). He explained

---

[8] Officer McMullan testified that if he is on vacation, ill or unable to work the detail due to his regular police work, another officer will work the detail for him. (Docket No. 22 at 68). There was no evidence introduced suggesting that these substitute officers engaged in any inappropriate behavior.

to the Court that throughout his tenure working the secondary employment detail at Blush, the Bureau has required him to annually fill out forms and request that he be able to continue working the detail. (*Id.* at 68-69). His applications to work at Blush have always been approved by the Bureau. (*Id.*).

  *I. Acting Chief McDonald's Decision of March 13, 2013*

  On March 13, 2013, Acting Chief McDonald sent Blush a one-line letter advising that it could no longer participate in the secondary employer program and terminated its status as an approved secondary employer.[9] (Docket No. 22 at 39, 138). Although this letter was not presented at the hearing nor admitted into evidence, Acting Chief McDonald explained that she advised Blush via the letter that it was a violation of § 13.6 of the Bureau's Policy to permit officers to work secondary employment details at such an establishment because the officer's presence there brought the "Bureau into disrepute." (*Id*. at 168). Blush was not granted any ability to protest or appeal the decision. (*Id.* at 39-40; 167-68). Acting Chief McDonald testified that she sent a similar letter to Cheerleaders, another adult entertainment establishment in the Strip District, and likewise terminated its status as an approved secondary employer. (*Id.* at 138). She did not terminate the status of any other approved secondary employers at that time and admitted that she had not investigated whether any other approved entities were in some way violating her interpretation of Order 29-1. (*Id.* at 169).

  Acting Chief McDonald stated confidently that the sole reason for her decision vis-à-vis Blush was the fact that it operated a "strip joint" and admitted that she would not have taken such action if it operated only as a bar. (Docket No. 22 at 158). To this end, on cross-examination, she engaged in the following exchange with defense counsel:

---

[9] The Court notes that the FOP has filed a grievance against the City challenging Chief McDonald's action. (*Id.* at 71-72, 184). As of the date of the Court's hearing, April 25, 2013, the grievance procedure remained pending and the Court has not been advised by the parties that the action has since concluded. (*Id.* at 184).

Q. So if I take adult entertainment outside of -- if I were to remove adult entertainment from my client's facility, would you agree that it is nothing more than your typical bar or night club?

A. Yes. If he closed the strip joint, then there wouldn't be an issue. It would just be a bar.

Q. So the sole basis for your decision is because of the adult entertainment?

A. That's correct.

(*Id.*).  In addition, Acting Chief McDonald admitted that she had received no complaints from officers or from the public about having officers stationed at Blush specifically.  (*Id.* at 158, 188).  She also has never been to Blush on official duties as a City police officer or as a patron in an unofficial capacity and thus has never observed any inappropriate or criminal behavior by anyone at the facility.  (*Id.* at 157, 182).  She likewise agreed that Blush was not a nuisance bar or in violation of any City zoning ordinances and admitted that Blush had no issues with outstanding invoices or non-payment of the cost recovery fee to the City.  (*Id.* at 158-59).  Prior to making her decision, Acting Chief McDonald conferred with a few higher commanders within the Bureau who she said agreed with her decision but she did not advise the FOP of the forthcoming action nor consult with the City's Legal Department to obtain a legal review of same.  (*Id.* at 161-62, 164).  She also did not conduct any independent research on her own about whether the decision was appropriate.  (*Id.* at 172).  In addition, she acknowledged that the role of the officers stationed at Blush consisted of only patrolling outside the establishment and that they did not work inside the facility, unless called upon to enforce laws, as if they were on-duty.  (*Id.* at 155-156).

Based on her demeanor during her testimony and her explanation of the decision, it is clear to the Court that Acting Chief McDonald has a strong personal distaste for adult

entertainment facilities like Blush. She repeatedly referred to the business as a "strip joint" throughout her testimony, a somewhat derogatory reference which was not used by any of the other witnesses at the hearing. (*See generally* Docket No. 22). Acting Chief McDonald also offered little support for the foundation of her decision, stating that she made the decision based on her knowledge of the types of activities that take place at "strip clubs," but admitted that she had never been inside any "strip club" and that her knowledge about "strip clubs" was obtained from discussions with her partner, information she had seen or heard in the media and other reading materials. (*Id.* at 182, 189). When challenged on these points during cross-examination, she stated that most adults have an understanding of what goes on at a "strip club," without any further explanation. (*Id.*).

In addition, she explained to the Court her unsuccessful efforts to have former Police Chief Nate Harper deny another adult business's application for participation in the secondary employment program a few years ago. (*Id* at 149-50). In that instance, she recommended that Chief Harper deny the application of "Controversy," a "strip club" which was formerly located on Carson Street in the West End, because the surrounding communities had fought the placement of the club in that location. (*Id.*). Acting Chief McDonald believed that because of the considerable opposition to the club, that City police officers should not be working off-duty details there. (*Id.*). Chief Harper overruled her recommendation and permitted City officers to work off-duty secondary employment details at Controversy until it closed for business reasons a few years ago. (*Id.*).

Defendants also introduced some additional evidence concerning their position, including the IACP Model Policy and two news articles. Def. Exs. B-D. Although the City has pointed out similarities between the language of the IACP Model Policy and Order 29-1, Acting Chief

McDonald testified that she had not read the IACP Model Policy since around the time it was issued in 1996 and therefore had not relied on it reaching her decision. (Docket No. 22 at 139-40). Lieutenant Ford confirmed that she had not referenced the IACP Model Policy prior to the decision terminating Blush's approved status. (*Id.* at 124-25). Acting Chief McDonald further advised that she could not recall if she specifically read the two articles which were submitted prior to sending the letter to Blush. (*Id.* at 137). She did, however, have conversations with news reporters who had questioned her regarding why the City of Pittsburgh permitted its officers to work details at "strip clubs" while other cities, including Honolulu and New Orleans, among others referenced, did not. (*Id.* at 137). Aside from the references in the news articles, there is no evidence before the Court which suggests that the City or the Acting Chief contacted the agencies in those cities to determine if the reporting of the restrictions placed on off-duty work of officers there was accurate. (*See* Docket No. 22). Acting Chief McDonald also admitted during cross-examination that she was unaware if any cities permitted officers to work details at "strip clubs." (*Id.* at 164-65). Instead, she suggested that a study of the policies employed by cities across the country is in the process of being completed as part of a broader review of the Bureau's Secondary Employment Program as a whole.[10] (*Id.*). However, she admitted that she had not yet seen any of the results of the pending study. (*Id.*).

Acting Chief McDonald also testified that she had received some public support for her

---

[10] Defendants also sought to introduce considerable testimony concerning the problems with crowd control and crime in the South Side entertainment district and the City's planned response to same. (Docket No. 22 at 142-46). Acting Chief McDonald testified that a pilot program is scheduled to be initiated in the summer months which would change how the Secondary Employment Program operates in that area. (*Id.*). She explained that during the pilot program, the off-duty officers would be hired by a pool of South Side bars to conduct foot patrols in the area rather than to be stationed at a post outside each bar. (*Id.*). She testified that this would provide greater police presence in the South Side and may be more effective in deterring crime. (*Id.*). As the Court held at the hearing, the evidence concerning the South Side is not directly relevant to the instant matter which concerns the administration of the Secondary Employment Program at Blush in the Cultural District. (*Id.* at 146). The evidence presented demonstrates that Blush is the only business in the area which is presently participating in the program and the witnesses did not testify that a similar pilot program was scheduled to be initiated in the Cultural District. (Docket No. 22 at 37-8, 142-46).

decision to terminate Blush's approved status. (*Id.* at 180). She mentioned that she had been thanked by members of the public for "taking a stand" in a number of instances including being approached in the mall and while walking in the City. (*Id.*). She also claimed that she had similar email communications supporting her decision with unnamed individuals, although no such documents were presented to the Court. (*Id.*).

Ultimately, the decision to terminate Blush's approved status as a secondary employer was made based on Acting Chief McDonald's personal opinion that the presence of officers at Blush brought the Bureau in disrepute based on her interpretation of § 13.6 of Order 29-1. (*Id.* at 160-61). The evidence presented to the Court demonstrates that the sole basis for this decision was the fact that Plaintiff's dancers and headliners engage in expressive conduct protected by the First Amendment, i.e., nude erotic dancing. (*Id.* at 155-56, 172). Acting Chief McDonald expressed that her interpretation of the policy was correct and that the policy was previously disregarded by the prior Chiefs of Police who had permitted officers to work details at Blush and other adult entertainment businesses. (*Id.* at 179). She added that since she became Acting Chief of Police, she had the authority and obligation to enforce her interpretation of the policy and stop the practice of permitting officers to moonlight at "strip clubs." (*Id.*). However, Acting Chief McDonald's opinion that a City police officer's mere presence at the facility brought the Bureau into disrepute was not shared by any of the other witnesses who testified at the hearing. Plaintiff's witnesses, including Officer McMullan, testified that they did not believe that the presence of officers at the facility had any negative affect on the Bureau. (*Id.* at 63). Defendants' other witness, Lieutenant Ford, was not directly questioned concerning whether she felt that permitting secondary employment at Blush brought the Bureau in disrepute. (*See* Docket No. 22). Instead, Lieutenant Ford testified consistently with Acting Chief McDonald

concerning their shared interpretation of Order 29-1, which allegedly supported the challenged action in this case.

### J. Acting Chief McDonald's Interpretation of Order 29-1

To this end, Defendants' witnesses explained that they believe that Order 29-1 grants the Chief of Police or his/her designee with the authority to approve or deny applications from entities seeking to become approved secondary employers and that secondary employment may be denied under § 13.6 "at a location that may tend to bring the Bureau of Police into disrepute or that may reduce the efficiency or usefulness of the officer as a member of the Bureau of Police." Pl. Ex. 1 at § 13.6. Ford and McDonald then noted that the phrase "bring the Bureau of Police into disrepute" is undefined in the Policy and turned to § 14.1.4 which lists "establishments that … provide entertainment or services of a sexual nature" as types of "outside employment" which are not permitted because such employment "present[s] a threat to the status or dignity of the police profession" to provide clarification of the undefined phrase. (Docket No. 22 at 104-05). In this regard, Acting Chief McDonald testified, as follows:

> I think this definition [of section 14.1.4] further explains 13.6. It was my understanding that a police officer could not work in these establishments off duty on an outside employment condition. Why would they be allowed to work in uniform in the same establishments?
>
> To me it didn't make any sense, and I think it reinforced -- it further defined what 13.6 was actually saying, which was my understanding of 13.6.
>
> …
>
> I'm saying that I don't agree to the fact that it's not relevant to the secondary employment definition. I'm saying that 13.6, which prohibits employment in any venue that would [bring] disrepute to the Pittsburgh Bureau of Police is not authorized.
>
> And it's my understanding when you look down at outside employment, that that explains it further, although it's not under

26

secondary employment, but I'm saying 13.6 is further explained by this section.

…

I looked at [section 14.1.4] in consideration of my interpretation, but I based my decision on the violation of the policy based on 13.6.

(Docket No. 22 at 155-56).

### K. *Blush's Operations After March 13, 2013 Decision*

Bortz testified that he received Acting Chief McDonald's March 13, 2013 letter on a Thursday or Friday but that he had been advised by Officer McMullan a day or so earlier of the decision to terminate services at his business. (*Id.* at 35-6). He credibly advised that upon receipt of the letter from Acting Chief McDonald, he was "scared to death about St. Patrick's Day" because his business was left with little time to prepare before the St. Patrick's Day parade on Saturday of that week. (*Id.*). He stated that they were "lucky" that they did not have any significant incidents at Blush during that weekend because they no longer had a City police officer stationed at the business during peak hours. (*Id.*).

Blush has operated since the March 13, 2013 decision without supplementing its core staff by hiring security guards or bouncers. (*Id.* at 22, 36, 50-1). Instead, Blush's floor managers have increased their presence on the floor in an effort to deter potential problems with patrons and to secure the facility. (*Id.* at 50-1). Bortz and West testified that they feel less secure without the police presence, especially at closing time around 2:00 or 2:30 a.m. (*Id.* at 24, 50-1). Bortz also stated that he has observed an increase in aggressive panhandlers outside his business. (*Id.* at 29-30). He and West both testified that they expect that Blush's customers feel less secure as well but Bortz indicated that the true effect of the lack of a police officer was unknown after only a period of six weeks. (*Id.* at 30).

Despite same, the lack of a police presence at Blush on Friday and Saturday nights has not affected its ability to draw customers or its financial performance. Indeed, Bortz explained that that March and April of 2013 were "exceptional" months for his business given the number of large events in the City during those months, including the St. Patrick's Day Parade, the Pittsburgh Pirates' opening day, the NCAA Frozen Four and numerous Pittsburgh Penguins' games. (*Id.* at 37). In addition, it is undisputed that there have been no reported criminal incidents at Blush from March 13, 2013 until the date of the hearing, April 25, 2013. (*Id.* at 67). Further, the parties agree that, despite the termination of secondary employment services, the Pittsburgh Bureau of Police will respond to any 911 calls it receives from Blush as it does for any other individual or business reporting criminal activity.

III. RELEVANT PROCEDURAL HISTORY

Plaintiff filed its Complaint against Defendants in the Court of Common Pleas of Allegheny County on March 27, 2013. (Docket No. 1 at ¶ 1). Defendants removed the case to this Court the following day. (Docket No. 1). Subsequently, on April 5, 2013, Plaintiff filed its Motion for Temporary Restraining Order or, in the Alternative, Motion for Preliminary Injunction and Memorandum of Law in Support of same. (Docket Nos. 3, 4, 5). Defendants responded on April 12, 2013 by filing a Reply, Brief in Support and Exhibits. (Docket Nos. 8, 9, 10). The Court held a motion hearing on April 25, 2013 during which the parties presented witness testimony and documentary evidence. (*See* Docket No. 22; Pl. Ex. 1-3; Def. Ex. B-D). The parties then submitted proposed findings of fact and conclusions of law and supporting briefs on May 15, 2013. (Docket Nos. 23-27). As the evidentiary record with respect Plaintiff's Motion has now closed and the matter has been fully briefed and argued, it is now ripe for disposition.

IV. LEGAL STANDARD

The grant or denial of a temporary restraining order or a preliminary injunction is within the sound discretion of the Court. *See American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). The primary purpose of preliminary injunctive relief "is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The decision to issue a preliminary injunction and/or temporary restraining order is governed by the same four-factor test, wherein Plaintiff must demonstrate:

> "(1) that [it is] reasonably likely to prevail eventually in the litigation and (2) that [it is] likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiff[…] and (4) whether granting relief would serve the public interest."

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)); *see also Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009) ("The standard used to evaluate whether the issuance of a temporary restraining order is warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate."). In reaching its decision on the request for injunctive relief, the Court sits as both the arbiter of legal disputes and trier of fact and is therefore tasked with resolving factual disputes and assessing the credibility of witness testimony. *See, e.g., Hudson Global Resources Holdings, Inc. v. Hill*, Civ. A. No. 07-132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007) ("A court considering

whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing, and base its decisions on credibility determinations.").

V. DISCUSSION

Plaintiff maintains that Acting Chief McDonald's decision to terminate its long-time status as an approved secondary employer under the Bureau's Secondary Employment Program due to her opinion that the presence of officers at Blush tends to bring the Bureau of Police into disrepute plainly infringes on its asserted rights under the Federal and Pennsylvania Constitutions. (Docket Nos. 3-5, 25-26). Defendants contend otherwise and suggest that Acting Chief McDonald was granted considerable discretion to make this decision based on her allegedly reasonable interpretation of an internal, non-public Bureau Policy, i.e., Order 29-1, which had never been produced to Plaintiff prior to this litigation. (Docket Nos. 8-9, 23-24). However, Defendants admit that the sole basis for the Acting Chief's decision is the type of business that Blush operates and the fact that its dancers engage in nude, erotic dancing which constitutes expressive conduct protected by the First Amendment to the Constitution and Article I, Section 7 of the Pennsylvania Constitution. (*Id.*). Defendants likewise concede that the Acting Chief targeted only adult entertainment businesses, i.e., Blush and Cheerleaders, for such action and would not have terminated Blush if the business discontinued the adult entertainment at the facility and operated only its bar. (*Id.*). Defendants also acknowledge that Blush was not provided with a pre-deprivation or a post-deprivation hearing with respect to the termination of its status as an approved secondary employer and denial of the ability to continue to participate in the program. (*Id.*).

In this Court's estimation, and for the reasons that follow, Plaintiff has presented sufficient evidence to demonstrate that it is likely to prevail on its constitutional claims alleging

violations of its rights to free speech and equal protection, and while Defendants have identified

a significant or important governmental interest possessed by both the Chief of Police and the

City in regulating the off-duty conduct of City police officers engaged in secondary employment

details, wherein they are dressed in their full uniforms, armed with their Bureau-issued weapons

and are expected to make full use of their arrest powers as if they were on-duty, Defendants have

not presented legally sufficient evidence to justify the purely discriminatory governmental action

taken by Acting Chief McDonald against Plaintiff. *See K.A.*, 710 F.3d at 105. Therefore, the

Court will enter a preliminary injunction and return the parties to the status quo of their

relationship prior to the issuance of Acting Chief McDonald's decision until this case can be

fully adjudicated on the merits. *Acierno*, 40 F.3d at 647. The Court now turns to its analysis of

the relevant factors, starting with whether Plaintiff is likely to succeed on the merits of its claims.

### A. Likely to Succeed on the Merits

> To establish a reasonable probability of success on the merits, the moving party must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. *See Punnett v. Carter*, 621 F.2d 578, 582–83 (3d Cir. 1980); *McCahon v. Pa. Tpk. Comm'n*, 491 F. Supp. 2d 522, 527 (M.D. Pa. 2007). Whether success is likely requires examination of legal principles controlling the claim and potential defenses available to the opposing party. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000). The mere possibility that the claim might be defeated does not preclude a finding of probable success if the evidence clearly satisfies the essential prerequisites of the cause of action. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001) (citing 11A Wright et al., supra § 2948.3).

*Stilp v. Contino*, 629 F. Supp. 2d 449, 457 (M.D. Pa. 2009) *aff'd and remanded*, 613 F.3d 405

(3d Cir. 2010).

Plaintiff's federal constitutional claims are brought pursuant to 42 U.S.C. § 1983, which

provides that:

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress ....

42 U.S.C. § 1983. This statutory provision "does not create substantive rights," but instead "provides a remedy for the violation of rights conferred by the Constitution or other statutes." *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). In order to establish a claim under the statute, a plaintiff "'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'" *Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)). Thus, a plaintiff cannot prevail without establishing an underlying violation of a federal constitutional or statutory right. *Collins v. City of Harker Heights*, 503 U.S. 115, 119, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (remarking that § 1983 "does not provide a remedy for abuses that do not violate federal law"). "Section 1983 'itself contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Board of County Commissioners v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (quoting *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The remedies available under section 1983 include prospective relief such as an injunction prohibiting future violations of federal law and a declaration that such state action violates federal law. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

Plaintiff's state constitutional claim is not cognizable under § 1983 because it is a statute designed to protect federal rights and may not be used by litigants as a vehicle to enforce

provisions of the Pennsylvania Constitution. *See* 42 U.S.C. § 1983; *see also Collins*, 503 U.S. at 119. "No Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution." *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011) (citing *Jones v. City of Philadelphia*, 890 A.2d 1188, 1216 (Pa. Cmmwlth Ct. 2006) ("[N]either Pennsylvania statutory authority nor appellate case law has authorized the award of money damages for violation of the Pennsylvania Constitution.")). However, Pennsylvania courts and the United States Court of Appeals for the Third Circuit have recognized that a plaintiff may maintain a successful cause of action directly under the provisions of the Pennsylvania Constitution for equitable remedies such as injunctive and declaratory relief. *See Pocono Mountain Charter Sch.*, 442 F. App'x at 688 (citing *Moeller v. Bradford County*, 444 F. Supp. 2d 316, 320–21 (M.D. Pa. 2006) ("[I]t is well settled that individual plaintiffs may bring suit for injunctive relief under the Pennsylvania Constitution") and *Jones*, 890 A.2d at 1216 ("[O]ther remedies, such as declaratory or injunctive relief ... are ... remedies under the Pennsylvania Constitution.")).

Plaintiff's claims and the defenses that have been raised to same must therefore be individually evaluated under the particular provisions of the Federal and Pennsylvania Constitutions, to which the Court now turns.

### 1. First Amendment Claim

Plaintiff's initial claim arises under the First Amendment to the Constitution of the United States. In the context of a First Amendment challenge, "[t]he most significant and, indeed, the dispositive prong of the preliminary injunction analysis ... is whether [Plaintiff] bore [its] burden of establishing that [it] had a reasonable probability of succeeding on the merits...." *ACLU v. Ashcroft*, 322 F.3d 240, 250–51 (3d Cir. 2003). The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const., Amend. I. The parties agree that Plaintiff's business features nude, erotic dancing by "dancers" and "headliners" and that these activities are protected by the First Amendment as expressive speech. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000). However, the parties dispute whether Acting Chief McDonald's decision to terminate Blush's approved secondary employer status and her further directive that City of Pittsburgh police are prohibited from working off-duty security details at adult establishments infringe on Plaintiff's rights protected by the First Amendment. (Docket Nos. 3-5, 8-9, 23-26).

Before addressing these matters, the Court must examine the nature of the relationship between the parties and the type of governmental action which is challenged by Plaintiff in this case because the parties also disagree on the level of deference that should be given to the challenged governmental action. (*See id.*). The parties' disputes are understandable because the issues raised appear to be novel and the Court is unaware of any prior decisions which address a factual scenario similar to the case at bar.

Plaintiff contends that the Acting Chief's decision terminating its ability to hire off-duty officers for secondary employment details is akin to a number of government benefit cases wherein little deference is granted to the government for taking unconstitutional sovereign action such as denying an individual's entitlement to government benefits for engaging in protected speech. *See e.g., Perry v. Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972); *Elrod v. Burns*, 427 U.S. 347, 359, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Speiser v. Randall*, 357 U.S. 513, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958). Defendants' view is that the case is more

properly analyzed as a personnel matter in the employer-employee context wherein the government is granted great deference to control the conduct of its employees, *see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), or, alternatively, that the government action in this case at most indirectly infringes on Plaintiff's First Amendment rights and should be evaluated under *United States v. O'Brien*, 391 U.S. 367, 377, 88 S. Ct. 1673, 1679, 20 L. Ed. 2d 672 (1968). The Court is also aware of a third line of cases addressing the First Amendment rights of government contractors, *see Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 678, 116 S.Ct. 2342, 135 L.Ed. 2d 843 (1996); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), pursuant to which the balancing test set forth in *Pickering* is adapted to the facts and circumstances of the contractual relationship between the government and contractor.

In this Court's estimation, the undisputed evidence establishes that, prior to March 13, 2013, the parties were engaged in an ongoing and long-standing commercial relationship whereby the Bureau was acting as a service provider and Plaintiff was a procurement contractor paying for government services. (Docket No. 22 at 17, 31, 36, 149-51, 176-77). It is likewise uncontested that the Bureau is the only service provider which is able to offer the secondary employment services of City police officers to businesses within the City limits. (*Id.* at 181, 185). Further, the parties largely agree that the services provided by these officers are superior to any comparable services offered by private security companies because City police officers provide security for businesses in full police uniforms, carry Bureau-issued weapons and are expected to make full use of arrest powers, as needed, whereas private security guards are not City police offices, have no arrest powers and must call 911 like any other citizen to effectuate

an arrest of an individual alleged to have committed a crime. (*Id.* at 18-19, 59-63, 151, 181-82, 197). While the nature of the services provided contain some elements of the entitlements discussed in the government benefits cases, and the case also involves a concurrent restriction placed by the government-employer on its personnel, it remains that the secondary employment services are provided by the City to private entities under a contractual agreement in exchange for financial compensation and that such services are provided in addition to general police services provided by the City to all members of the public and businesses. Given same, the Court finds that this case is more properly evaluated initially under the rubric of the government contractor cases such as *Unbehr* and *O'Hare* rather than the government benefits cases or employer-employee cases argued by the parties. *See McClintock v. Eichelberger*, 169 F.3d 812, 817 (3d Cir. 1999) ("Protection of an independent contractor with a pre-existing commercial relationship with the public entity from retaliation by reason of his [protected activities] plainly protects his First Amendment rights.").

Under this precedent, it is well-settled that the government is able to terminate pre-existing service contracts with independent contractors; however, it may not generally terminate such relationships in retaliation for the contractor's engaging in activities protected by the First Amendment. *See Umbehr*, 518 U.S. at 678; *see also O'Hare Truck Serv., Inc.*, 518 U.S. at 116. While the government may escape liability by demonstrating that it took the challenged action for reasons unrelated to the plaintiff's protected speech, if the plaintiff establishes that the government terminated its pre-existing contractual relationship for discriminatory reasons, the burden shifts to the government to justify its termination decision. *See Umbehr*, 518 U.S. at 678, 685. The level of deference granted to the government's decision is a fact-based inquiry wherein the Court must balance the interests of the parties by examining the contractual

relationship and the nature of the government action. *Id.* at 678. If the government is determined to be exercising its sovereign power against the plaintiff, its decision must pass strict scrutiny.[11] *Id.* If the governmental action is instead more properly characterized as exercising its contractual power, more deference is "due to the government's reasonable assessments of its interests *as contractor*." *Id.* (emphasis in original).

In this case, Defendants are not actively regulating Blush's conduct (including the nude, erotic dancing that takes place at the facility) or imposing any sovereign action on Blush.[12] Rather, Acting Chief McDonald took action pursuant to a contractual agreement between the parties when Blush's approved secondary employer status and ability to continue to participate in the program was terminated. Accordingly, the Court must weigh the government's legitimate interests under the contract against Plaintiff's free speech interests. *See Umbehr,* 518 U.S. at 685.

---

[11]     Under a strict scrutiny analysis, the government action will only be upheld if it: (1) serves a compelling governmental interest; (2) is narrowly tailored to achieve that interest; and (3) is the least restrictive means of achieving that interest. *See ACLU v. Mukasey,* 534 F.3d 181, 190 (3d Cir. 2008). Under an intermediate scrutiny analysis, the government must demonstrate a "substantial governmental interest" in the action and rational basis review requires that a law should be upheld if the government can articulate a rational basis for its enactment. *See Free Speech Coal., Inc. v. Attorney Gen. of U.S.,* 677 F.3d 519, 534 (3d Cir. 2012).

[12]     The Court recognizes that the Supreme Court has commented that the expressive conduct of nude, erotic dancing is "within the outer ambit of First Amendment protection," but it is protected nonetheless. *See City of Erie,* 529 U.S. at 289. The Court understands that that content-neutral regulations of protected expressive conduct are generally evaluated under the intermediate scrutiny test set forth in *O'Brien,* 391 U.S. at 377 and *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 567 (1991). Under this test, a content-neutral law proscribing expressive conduct is justified if:

> 1) it is "within the constitutional power of the Government"; 2) it "furthers an important or substantial governmental interest"; 3) "the governmental interest is unrelated to the suppression of free expression"; and 4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

*181 S. Inc. v. Fischer,* 454 F.3d 228, 233 (3d Cir. 2006) (quoting *Barnes,* 501 U.S. at 567, 111 S.Ct. 2456, *which quoted O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673). Although the *O'Brien* test is not directly applicable here because the challenged governmental action is the termination of a contractual relationship with a government contract rather than a sovereign act of regulation, the Court has considered same to the extent that it informs its analysis of the weight to be given to the parties' respective interests.

At the hearing, Acting Chief McDonald testified unequivocally that she terminated Blush's status as an approved secondary employer and denied it the ability to continue to hire officers for secondary employment details based *solely* on the fact that it operates a "strip joint," where its dancers engage in nude, erotic dancing which is protected as expressive conduct under the First Amendment. (Docket No. 22 at 158). She also admitted, among other things, that neither Blush nor Officer McMullan had acted in any manner outside the scope of the Bureau's policies and procedures such that termination of Blush's secondary employer status was warranted for some other reason. (*Id.* at 155-59, 182). The United States Court of Appeals for the Third Circuit has observed that a First Amendment retaliation claim is always actionable, even when the alleged retaliatory act is "relatively minor" or "trivial," if it can be proven that the circumstances "would be sufficient to deter a person of ordinary firmness from exercising his or her free speech rights." *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006) (internal quotation omitted). This "deterrence threshold" is "very low" and is met "by all but truly de minimis violations." *Id.* at 128. The Court is persuaded that based on Acting Chief McDonald's admissions and the termination of the contract, which is certainly more than a de minimis violation, Plaintiff has presented sufficient evidence under *Umbehr* and *O'Hare* to shift the burden to Defendants to introduce evidence to justify the termination of Blush's contract due to its exercise of rights protected under the First Amendment. *See Umbehr*, 518 U.S. at 678, 685.

Defendants' justification of the decision is essentially two-fold: first, that the Chief of Police and the City have a compelling government interest in regulating the off-duty conduct of City police officers, including their participation in off-duty secondary employment details at certain locations; and, second, that the act of terminating Blush's secondary employer status was

supported by Bureau Policy, i.e., Order 29-1.  (Docket Nos. 8-9, 23-24).  Defendants suggest that their interests outweigh Plaintiff's need for the secondary employment services of off-duty City police officers at its facility such that Plaintiff cannot demonstrate that it is reasonably likely to succeed on the merits of its First Amendment claim.  (*Id.*).  In this Court's estimation, the evidence presented by Defendants to this point is insufficient to conclude that Acting Chief McDonald's exercise of purported contractual rights by terminating Blush's secondary employment status was supported by the parties' contract or the Bureau's Policy and the evidence further fails to adequately demonstrate that the presence of officers working off-duty secondary employment details at Blush actually brought disrepute upon the Bureau as Acting Chief McDonald opined.

The parties do not meaningfully dispute that the Bureau and Chief of Police have a significant or important governmental interest in regulating the off-duty conduct of City police officers.  (*See* Docket Nos. 3-5, 8-9, 23-26).  To this end, it is well within the power afforded to the Bureau and Acting Chief McDonald to limit *all* off-duty employment of City police officers, or to the extent it permits same, proscribe reasonable limitations on such off-duty employment, as has been done by the Bureau under Order 29-1.  *See Rhodes v. Smith*, 273 S.C. 13, 15, 254 S.E.2d 49, 50 (1979) ("Regulations prohibiting [a]ll outside employment [of police officers] have been upheld.") (citations omitted); *see also State Troopers Non-Commissioned Officers Ass'n of New Jersey v. New Jersey*, 399 F. App'x 752, 755 (3d Cir. 2010) (citations omitted) ("Several courts have recognized the government's interest in preserving public trust as a legitimate objective underlying restrictions on secondary employment.").  Subject to certain terms and conditions set forth therein, Order 29-1 permits City police officers to work secondary employment details for private entities whereby they effectively act as City police officers

stationed outside a private business.  *See* Pl. Ex. 1 at § 2.1 (secondary employment is "[a]ny employment of a member by a private entity that is conditioned on the actual or potential use of law enforcement powers by the police officer employee.").  Given that the role of a police officer is to serve and protect the public and the authority vested in them to do so, including the power to make arrests, our society demands that police officers be held to a higher standard than ordinary citizens in many matters, particularly when dressed in the official uniform and wearing the badge of the police force.  *See e.g.*, *Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Philadelphia*, Civ. A. No. 11-3256, 2013 WL 638615, at *11 (E.D. Pa. Feb. 21, 2013) ("Because police are vital to protecting the public's safety and are granted the power to make arrests and use necessary force to carry out that duty, they must be held to a higher standard of conduct than other City employees, which may include broader restrictions on First Amendment activity."); *Faust v. Police Civil Serv. Comm'n of Borough of State Coll.*, 22 Pa. Cmwlth. 123, 128, 347 A.2d 765, 768 (Pa. Cmwlth. Ct. 1975) ("police officers are held to a higher standard of conduct than other citizens, including other public employees.").  Therefore, the Bureau and Acting Chief clearly have an important or substantial governmental interest in regulating the conduct of City police officers who are engaged in off-duty secondary employment details as a method to preserve the public trust and to manage its personnel as employer.

However, the Defendants' important or substantial interest in regulating the conduct of City police officers is not squarely at issue when they enter the marketplace and contract with third parties to act as a provider of these services.  *See Umbehr*, 518 U.S. at 678, 685.  Thus, the governmental interests in the present matter must be determined from the facts and circumstances of the contractual relationship between the Bureau as the government service

provider and the third party purchaser of such services, Blush. *Id.* In this Court's estimation, the present record is inadequate to demonstrate that the Acting Chief's actions were made in accordance with the terms of the parties' long-standing commercial relationship.

The primary justification for the Acting Chief's decision which has been advanced by Defendants is that such action was authorized by the Bureau's Policy on Secondary Employment. (Docket Nos. 23-24). Acting Chief McDonald's interpretation of Order 29-1, which was shared at least by Lieutenant Ford, is that the presence of officers in a secondary employment capacity at an adult entertainment establishment violates the Bureau's Policy. (Docket No. 22 at 155-56). More specifically, they opine that the Chief of Police is granted discretion to approve or disapprove of applications of entities to become secondary employers and that under § 13.6 of Order 29-1 "secondary employment" may be denied at any location which the Chief determines "may bring the Bureau into disrepute." (*Id.*). They further reason that because § 14.1.4 specifically restricts officers from working "outside employment" at adult establishments, that § 13.6 should be interpreted to prevent secondary employment at adult establishments as well. (*Id.*). Having fully considered the matter, the Court does not believe that the evidence presented at the hearing is sufficient to demonstrate that Plaintiff agreed to be bound by § 13.6 of Order 29-1 and, alternatively, even if Plaintiff was bound by all of the provisions of Order 29-1, the proper interpretation of Order 29-1 does not grant the Chief of Police the specific authority to unilaterally terminate the status of a previously approved secondary employer for any reasons aside from non-payment of the necessary cost recovery fee or perhaps acts of malfeasance or wrongdoing which otherwise violate the terms of the policy.

With respect to the Court's finding that the evidence fails to demonstrate that Plaintiff was bound by Order 29-1, the record establishes that the parties' commercial relationship began

in 1966 and was maintained for many years without any written agreement. (Docket No. 22 at 17, 103-04, 151-52). However, since at least 2007, the parties have formalized their agreement in writing by virtue of an application/agreement form which is executed by Plaintiff and sent to the Bureau for approval by the Chief of Police. (*Id.* at 31, 179; Pl. Ex. 1 at § 7.2 (noting requirement that secondary employer execute "Secondary Employment Application Agreement"). Most recently, Plaintiff submitted such a form to the Bureau in November of 2012 and it was approved by former Chief of Police Nate Harper, reauthorizing Blush to continue to be an approved secondary employer. (Docket No. 22 at 176-77, 179). As such, the parties' relationship was governed by the November 2012 version of the agreement on the date of the termination, i.e., March 13, 2013.

While it is clear from the testimony that a written agreement between the parties exists, it has not been admitted into evidence. (*See* Docket No. 19-1, Exhibit List). Therefore, the Court is without the benefit of the actual terms and conditions of the agreement in rendering this decision and must rely on the parties' description of the relevant provisions. To this end, Defendants' witnesses testified that the prospective secondary employers must agree to be bound by the policies and procedures of the Bureau in regard to secondary employment before the application will be approved by the Chief of Police. (Docket No. 22 at 122-23, 176). The witnesses also explained that the Bureau's policies and procedures on these matters are set forth in Order 29-1, which was admitted into evidence. *See* Pl. Ex. 1.

However, Defendants' witnesses admitted that Order 29-1 is a non-public document which is not fully disclosed to secondary employers, even upon request. (Docket No. 22 at 122, 176). They clarified that the policies and procedures are only summarized by the Bureau as a part of an information packet that is sent out to the prospective secondary employer after it has

been approved. (*Id.*). Like the written agreement, the information packet sent to Blush was not admitted into evidence nor was a standard information packet. (*See* Docket No. 19-1, Exhibit List). Instead, Defendants' witnesses explained generally that the summary of the policies and procedures contained therein would necessarily include information concerning the payment of the cost recovery fee to the City, the scheduling of off-duty officers for details and the payment options available to the secondary employer to pay the wages due to the officers. (Docket No. 22 at 176). Importantly, Defendants' witnesses did not testify that the summary provided to the secondary employers generally or to Blush specifically would have included any information stating that the Bureau could terminate the relationship or revoke its status as an approved secondary employer based on § 13.6 of Order 29-1 or if the Chief of Police determined that the presence of its officers at that location would "bring the Bureau into disrepute." (*Id.*). There is likewise no evidence that, prior to March 13, 2013, the Bureau had expressed any foreseeable problems to Blush about the nature of Blush's business and/or the fact that permitting City police officers to work there in a secondary employment capacity was prohibited by the Bureau's policy. (*Id.* at 33). In all, the Court finds that based on the present record, there is no evidence that Blush specifically assented to the terms of Order 29-1 which Acting Chief McDonald enforced in terminating its approved secondary employer status.

The Court also disagrees with the Defendants' proffered interpretation of Order 29-1, to the extent that it is enforceable against Plaintiff. First, the Court does not believe that Order 29-1 is properly interpreted as granting the Chief of Police discretion to unilaterally revoke the previously approved secondary employment status of an entity without just cause. *See* Pl. Ex. 1. To this end, Order 29-1 is clear on its face that the Chief of Police is granted discretion to approve or disapprove of a prospective secondary employer's *application* to participate in the

program.  *See* Pl. Ex. 1 at § 7.2 ("The 'Secondary Employment Application Agreement' is reviewed, approved or disapproved by the Chief of Police or his/her designee.").  However, the Policy expressly references only a single basis for the termination of a previously approved secondary employer's status, i.e., non-payment of the applicable bills due to the City, including the cost recovery fees.  *See* Pl. Ex. 1 at §§ 7.4.1.2; 7.4.2.4; 7.4.3.5 ("Failure to pay this bill within thirty (30) days of receipt may result in the revocation of the secondary employer's approved status.").  Defendants' witnesses admitted that Blush was previously approved as a secondary employer on numerous occasions and as recently as November of 2012, that it was current in its account and never had any issues with non-payment of the applicable fees.  (Docket No. 22 at 158-59, 176-77, 179).  As such, there is no evidence presently in the record that Blush violated the express terms of Order 29-1, insofar as the Court assumes that the evidence is sufficient that Blush agreed to be bound by same.

Second, the Court is not persuaded that Blush violated any other aspect of the Policy which would possibly support the termination of its approved secondary employment status. Again, the evidence is undisputed that the City and/or Bureau have never found that Blush violated any aspect of the Policy prior to March 13, 2013.  (*Id.* at 33, 157-59, 188).  The Bureau has also never received any formal complaints concerning Blush and/or the officers who provided secondary employment services there.  (*Id.* at 158, 188).  One of them, Officer McMullan, testified credibly that he has adhered to the Bureau's policies and procedures at all times while he was serving at Blush in an off-duty capacity.  (*Id.* at 63-5, 74).  As there is no evidence of any malfeasance by the individual officers or Blush's staff, there is no independent basis for the decision to terminate Blush's secondary employment status.

Third, the Defendants' proffered interpretation that sections 13.6 and 14.1.4.1 of Order 29-1 prohibit City police officers from working at an adult entertainment facility of the Policy is not supported by the present record. (*Id.* at 155-56). In this regard, Defendants concede that the past Chiefs of Police have never interpreted the Policy to prohibit secondary employment in the manner they propose while they held the position[13] and that Blush has been approved as a secondary employer on multiple occasions. (*Id.* at 31, 176-77, 179). In addition, both sections 13.6 and 14.1.4.1 concern the ability of officers to work at certain locations and do not directly address the status of an entity as an approved secondary employer. *See* Pl Ex. 1 at §§ 13.6, 14.1.4.1. Further, Acting Chief McDonald acknowledged that the primary provision supporting her decision, § 14.1.4.1, did not apply to secondary employment details but governed only outside employment. (Docket No. 22 at 155-56). While Acting Chief McDonald stated that it did not "make sense" to her why the Bureau would permit officers to work in a secondary employment capacity at an adult entertainment facility but would not permit them to work there in an outside employment capacity, (*see id.*), the credible testimony at the hearing established that there are fundamental differences between outside employment and secondary employment under the policy such that Plaintiff is reasonably likely to succeed in its claim challenging her action.

To this end, the off-duty outside employment of officers is basically a second, non-law enforcement position where officers act as normal employees of those businesses rather than as City police officers. (*See* Pl. Ex. 1 at §§ 2.2, 14.0, *et seq.*; Docket No. 22 at 119, 149, 155-56,

---

[13]     Acting Chief McDonald recounted that she recently spoke to former Chief of Police Robert McNeilly and he advised her that he did not know that officers had been working secondary employment details at "strip clubs" and that he would have stopped the practice if he had been aware while he was Chief. (Docket No. 22 at 150). There was no objection to this answer but it is classic hearsay. In any event, it seems incredible to the Court that Order 29-1 was developed during Chief McNeilly's tenure, that as Chief he was required to approve all applications for approval but that he was unaware of the details at "strip clubs," which, again, had been a common practice since at least 1966.

194).    Sergeant LaPorte stated that outside employment would include working in a retail position at Home Depot or Giant Eagle and performing jobs stocking shelves or as cashiers inside the premises of the businesses.    (Docket No. 22 at 194).    This type of off-duty employment is not extensively regulated by the Bureau or Chief of Police.  Pl. Ex. 1 at §§ 2.2, 14.0, *et seq.*    Indeed, aside from the general definition of outside employment in § 2.2, the policies for same are only mentioned in § 14.0 of Order 29-1.  *Id.*  Order 29-1 neither requires the Chief of Police to approve an entity as an outside employer nor necessitates an officer to seek permission from a commanding officer prior to engaging in such work.  *Id.*  Section 14.0 succinctly states that officers are permitted to engage in outside employment if: such employment is not performed during normal work hours or interferes with police business; the employment does not present a potential conflict of interest with the police department's work; and "the employment does not constitute a threat to the status or dignity of the police as a professional occupation … [such as] [e]stablishments that … provide entertainment of a sexual nature."  Pl Ex. 1 at §§ 14.0, *et seq.*

In contrast, off-duty secondary employment is extensively regulated by the Bureau and Chief of Police as the remainder of the provisions in Order 29-1 detail substantial policies and procedures governing same.  *See generally* Pl. Ex. 1.  Of note, all secondary employers must be approved by the Chief of Police.  *Id.* at § 7.2.  The individual officers must also receive approval from the Chief of Police to work secondary employment details and the Chief may deny secondary employment to an officer at a location which may tend to bring the Bureau into disrepute.  *Id.* at §§ 3.1, 13.0, *et seq.*  Among other things, the Policy restricts the number of hours that an individual officer can work and sets the parameters of the type of duties which may be performed during the detail.  *Id.* at §§ 3.1, 5.0, 13.0, *et seq.*  The permissible role of off-duty

officers who work details at facilities that serve alcohol, like Plaintiff's Blush facility, is very restricted. *Id.* at § 13.5. In this regard, Order 29-1, § 13.5, states generally that off-duty officers: must work outside the business; may not "card" patrons to ensure that they are of age to enter the establishment; are unable to conduct "pat downs," or use electronic metal detection devices to "wand" patrons entering the facility to determine if weapons are present; and are prohibited from enforcing the businesses' rules or acquiescing to directives by their staff. *Id.* At most, the policy permits off-duty officers to be stationed directly outside the door of such a facility and to "respond inside to handle any disturbances, crimes, etc., occurring in the establishment" in the same manner they would as if they were on duty and patrolling in the area. *Id.*

In all, Order 29-1 prohibits a City police officer from working at Blush in an outside employment capacity as a dancer, bartender or in some other capacity *inside* the establishment. *See* Pl. Ex. 1 at §§ 14.0, *et seq.* It is clear that the policy-makers within the Bureau determined at some point that having its police officers work *inside* an adult entertainment facility may constitute a threat to the dignity of the police profession. *Id.* at § 14.1.4.1. Based on the present record, it appears that the FOP did not oppose this restriction placed on its members to refrain from working second jobs *inside* adult entertainment establishments as there is no evidence that the FOP objected to this aspect of the Policy during its 15-day review period. (Docket No. 22 at 101). The reasons for this restriction remain unstated, aside from the fact that the IACP Model Policy contains a similarly phrased restriction on "regular off-duty employment" which is defined akin to outside employment under the Bureau's Policy and the Bureau typically uses such model policies to create its own policies. *See* Def. Ex. B.

But, whether the outside employment provisions of the policy infringe on Blush's First Amendment rights is not at issue in this litigation because Blush has not attempted to hire off-

duty officers to work *inside* its facility in any capacity. Instead, Blush seeks to continue to hire off-duty officers to work *outside* the facility in a secondary employment capacity at his or her post located on 9th Street (or within a lobby area during inclement weather) as it has done for a number of years with the approval of the Chief of Police and this type of secondary employment is simply not expressly barred by the Policy. The evidence produced by Defendants at the hearing does not demonstrate otherwise.

To this end, Defendants rely on the present interpretations of the policy by Acting Chief McDonald and Lieutenant Ford, neither of whom stated that they actually participated in the drafting of the policy in question. (Docket No. 22 at 155-56). While both testified that they looked to the outside employment provisions to provide a definition of what type of secondary employment would bring the Bureau into disrepute, a phrase which is undefined in the policy, they offered no more than their unsupported personal opinions of the policy language. (*Id.* at 155-56, 16-61, 172 (McDonald stating with respect to her decision that "[i]t was my opinion based on my understanding of what strip clubs actually were.")). They did not consult the City's Legal Department for clarification. (*Id.* at 161-62, 164). They conducted no additional research. (*Id.* at 172). They also did not reference the IACP Model prior to making the decision. (Docket No. 124-25, 139). However, even if they had, like Order 29-1, the IACP Model restricts only regular off-duty employment at adult entertainment facilities but contains no corresponding restriction on "extra-duty employment" which appears to be equivalent to secondary employment under the Bureau's Policy. *See* Def. Ex. B.

Fourth, even assuming that the decision was within the discretion of Acting Chief McDonald, such discretion cannot be exercised in a discriminatory manner, absent a substantial justification for the action. *See Umbehr*, 518 U.S. at 678, 685. While the Bureau and Chief of

Police have a substantial or important governmental interest in regulating the secondary employment details of officers, Defendants have not demonstrated that they have a substantial or important governmental interest in terminating Blush's status as an approved secondary employer based solely on the nature of its business. *Id.*

The mere facts that the Acting Chief of Police was questioned by reporters concerning why off-duty officers were permitted to work at strip clubs and two op-ed pieces were published by local newspapers questioning the practice, without more, are not sufficient to justify the Acting Chief's admittedly discriminatory termination of the contractual relationship. Indeed, although the article published on Triblive.com references several other cities which may restrict such off-duty employment at strip clubs, Defendants admitted no evidence that anyone at the Bureau (or the City's Legal Department, which was not consulted) followed-up with the referenced law enforcement agencies to determine if the information in the articles was correct. (*See* Docket No. 22). Acting Chief McDonald merely stated that the Bureau is presently studying the policies of other departments but conceded that she has not seen any of the results of such study. (*Id.* at 164-65). She further told the Court that she had received support for her decision prohibiting moonlighting at "strip clubs" from unnamed individuals who approached her walking in the City and in the mall and possibly received emails to this effect from citizens, although no such emails were admitted into evidence. (*Id.* at 180). While these communications did not amount to formal complaints, based on her testimony, the Court understands that they were received *after* the decision to terminate had already been made. (*Id.*). Further, the present evidentiary record shows that City police officers have worked weekend secondary employment details standing on 9th Street in downtown Pittsburgh in full view of the public for a period of *forty-eight years* and Defendants have failed to present a formal complaint from a single citizen

questioning this practice. (*Id.* at 17, 158, 188). All told, there is simply not enough evidence to justify the challenged action which was admittedly made purely for discriminatory reasons.

After carefully considering all of the evidence in the present record, the Court holds that Plaintiff is likely to succeed on the merits of its First Amendment claim because Acting Chief McDonald terminated its secondary employment status based solely on the fact that Plaintiff's dancers engage in expressive conduct protected by the First Amendment and Defendants have not presented sufficient evidence to justify this decision. *See Umbehr*, 518 U.S. at 678, 685. Accordingly, the Court will issue a preliminary injunction enjoining Defendants from terminating the relationship in violation of Plaintiff's First Amendment rights until this matter can be fully litigated on the merits. *See K.A.*, 710 F.3d at 105.

### 2. Pennsylvania Constitution Claim

Plaintiff also alleges that its rights to freedom of expression under Article I, § 7 of the Pennsylvania Constitution have been infringed by the challenged decision and seeks a declaration that its rights have been so violated and an injunction preventing similar violations in the future. (Docket No. 1-1). The relevant portion of Article I, § 7, provides:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

Pa. Const. art. I, § 7. The parties once again agree that the nude, erotic dancing which occurs at Plaintiff's business is protected by this provision of the Pennsylvania Constitution as expressive speech. (Docket Nos. 3-5, 8-9, 23-26). Defendants raise similar arguments to this claim as they did with respect to Plaintiff's First Amendment claim. (Docket Nos. 8-9, 23-24).

While the protections afforded by the federal and Pennsylvania Constitutions are similar; the Supreme Court of Pennsylvania has recognized that the Pennsylvania Constitution "'provides

protection for freedom of expression that is broader than the federal constitutional guarantee.'" *Pap's A.M. v. City of Erie ("Pap's II")*, 571 Pa. 375, 399 (Pa. 2002) (quoting *Commonwealth, Bureau of Professional & Occupational Affairs v. State Bd. of Physical Therapy*, 556 Pa. 268, 728 A.2d 340, 343–44 (1999), and citing *Insurance Adjustment Bureau v. Insurance Comm'r*, 518 Pa. 210, 542 A.2d 1317, 1324 (1988)). Therefore, Plaintiff's rights under the Pennsylvania Constitution are at least as broad as those it possesses under the First Amendment and it possibly has greater protection under the Pennsylvania Constitution. Accordingly, for the reasons stated in the preceding section analyzing Plaintiff's First Amendment claim, *see* § V.A.1, *supra*, the Court also holds that Plaintiff is likely to succeed on the merits of its claim challenging the termination of its secondary employer status and denial of future participation in the program under Article I, § 7 of the Pennsylvania Constitution. *See K.A.*, 710 F.3d at 105.

### 3. Equal Protection

Plaintiff next contends that Defendants are liable under an equal protection theory. (Docket No. 1-1). The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV, § 1. This constitutional provision "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). "The primary purpose of the Equal Protection Clause is 'to secure every person within [a] State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by [the] express terms of a statute or by its improper execution through duly constituted agents.'" *Whittaker v. County of Lawrence*, 674 F.Supp.2d 668, 691 (W.D.Pa. 2009) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923)) (brackets in original). If a law creates a classification that is based upon a suspect or quasi-suspect class or burdens the exercise of a fundamental right, it

must be evaluated under strict or intermediate scrutiny. *Id.* at n.7. In contrast, a law that does not fall within these categories including those that discriminate against a particular group which is not a suspect or quasi-suspect class and "class of one" claims are evaluated under the rational basis test, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam), pursuant to which laws are "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439-40, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

In addition, "[s]elective discriminatory enforcement of a facially valid law is unconstitutional under the Equal Protection Clause." *Jewish Home of E. PA v. Centers for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) (citations omitted). To establish a selective enforcement claim, a plaintiff must prove that: (1) it was "treated differently from other similarly situated individuals"; and (2) "that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, … or to prevent the exercise of a fundamental right." *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting *Holder v. City of Allentown*, 987 F.2d 188, 197 (3d Cir. 1993)).

As is noted above, the Court has concluded that Plaintiff is likely to succeed on its First Amendment claim as it has presented sufficient evidence to demonstrate that the challenged action was taken solely for discriminatory reasons and was not substantially justified by the evidence presented by Defendants at the hearing. *See* § V.A.1, *supra*. The evidence of record also supports a finding that Plaintiff is likely to succeed in its Equal Protection claim, for many of the reasons that have already been discussed. *See id.* In addition, the Court notes the following.

The Equal Protection violation claim in this case asserts that Plaintiff was treated differently than other bars and restaurants that participate in the Bureau's Secondary Employment Program. (Docket No. 1-1). The undisputed evidence before the Court shows that Plaintiff was indeed treated differently than other entities that are approved secondary employers under the Policy. To this end, Acting Chief McDonald asserted that her decision to terminate Plaintiff's status was made based on § 13.6 of the Policy and she admitted that she did not review all of the secondary employers presently participating in the program to determine if they were acting in compliance with that provision. (Docket No. 22 at 155-56, 167-69). Instead, she terminated Blush and Cheerleaders solely because they operated as adult entertainment establishments without determining if any other entity was presently violating her interpretation of the Policy. (*Id.*). As the Court has explained above, she did so without substantial justification for the disparate treatment between these types of businesses or any evidence of malfeasance, non-payment or any other potentially non-discriminatory reason and despite the fact that both were previously approved as secondary employers by the former Chief of Police as recently as November 2012. For these reasons, and the others previously expressed, Plaintiff is likely to succeed on the merits of its Equal Protection claim. *See K.A.*, 710 F.3d at 105.

### 4. Due Process

Plaintiff's final claim alleges that Defendants have violated its rights to procedural due process under the Fourteenth Amendment. (Docket No. 1-1). Defendants maintain that Plaintiff does not have a constitutionally protected property right in its continued participation in the Bureau's Secondary Employer Program. (Docket Nos. 8-9, 23-24). The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const., Amend. XIV, § 1. This constitutional provision provides individuals with "both substantive and procedural rights." *Albright v. Oliver*,

510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion). "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them," the Due Process Clause "serves to prevent governmental power from being used for purposes of oppression." *Daniels*, 474 U.S. at 331, 106 S.Ct. 662 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277, 18 How. 272, 277, 15 L.Ed. 372 (1856)). "By requiring the government to follow appropriate procedures when its agents decide to deprive any person of life, liberty, or property, the Due Process Clause promotes fairness in such decisions." *Daniels*, 474 U.S. at 331, 106 S.Ct. 662. The "substantive" and "procedural" requirements of the Due Process Clause are attributable to these distinct legal principles. *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

"In any case involving a procedural due process claim, the first question for consideration is whether the plaintiff has been 'deprived' of a constitutionally-protected liberty or property interest." *Burns v. Alexander*, 776 F. Supp. 2d 57, 79 (W.D. Pa. 2011) (quoting *Whittaker v. County of Lawrence*, 674 F.Supp.2d 668, 693 (W.D. Pa. 2009)). In the context of state police officers challenging their right to engage in off duty employment, the United States Court of Appeals for the Third Circuit recognized that:

> [t]he Fourteenth Amendment's procedural due process component does not protect every benefit in which employees claim an interest. To establish a protectable property interest, a plaintiff must show "more than an abstract need or desire for it. He must have more than unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Entitlements may be created expressly by state laws or regulations or may arise from government policy or a "mutually explicit understanding between a government employer and employee." *Carter v. City of Philadelphia,* 989 F.2d 117, 120 (3d Cir.1993).

*State Troopers Non-Commissioned Officers Ass'n of New Jersey v. New Jersey*, 399 F. App'x 752, 755 (3d Cir. 2010).

The Court looks to state law to determine if an entitlement to a property right has been established by virtue of the past practice between the Bureau and Plaintiff, an agreement between the parties or the City's Policy. *See Piecknick v. Com. of Pa.*, 36 F.3d 1250, 1256 (3d Cir. 1994) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (holding that property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.")). It is well-settled under Pennsylvania law "that a contract for services having no specific term is terminable at will." *Piecknick*, 36 F.3d at 1256 (citations omitted). Further, the Court of Appeals has held that such an "at will" contractual relationship is insufficient to demonstrate a federally protected right guaranteeing the continued right to services supplied by the government. *See id.* In addition, the Court of Appeals has recognized that "'[l]ongevity alone' does not create a property interest." *State Troopers*, 399 F. App'x at 755 (quoting *Hadley v. Cty. of DuPage*, 715 F.2d 1238, 1244 (7th Cir. 1983)). Further, the Court of Appeals has held that internal police bureau policies are not the force of law and thus are insufficient to create enforceable constitutional rights under the Due Process Clause in third parties not directly bound by them. *See Piecknick*, 36 F.3d at 1256-57.

In this Court's opinion, whether Plaintiff is likely to succeed on the merits of its procedural due process claim will necessarily rely on the terms and conditions of the parties' written agreement because the lengthy business relationship between the parties alone is insufficient to create a cognizable property interest under the Due Process Clause. *See State Troopers*, 399 F. App'x at 755. Moreover, absent an agreement by the parties that Plaintiff will

be bound by same, Order 29-1 is likely insufficient to create a cognizable constitutional right in Plaintiff by itself. *See Piecknick*, 36 F.3d at 1256-57. As is noted above, it is undisputed that the parties' relationship is governed by a written agreement; however this agreement was not produced by the parties at the hearing and it likely remains in the custody and control of Defendants. Therefore, the Court is without sufficient information to presently render a decision that Plaintiff has established a right protected by the Due Process Clause which may support a procedural due process claim. At any rate, given the Court's prior findings that Plaintiff is likely to succeed on the merits of its other claims, and the scope of the requested injunction is the same with respect to all of its claims, this decision has no bearing on the potential issuance of the preliminary injunction.

### B. *Irreparable Injury*

The next step in the Court's analysis is to determine whether Plaintiff will sustain irreparable injury if preliminary injunctive relief is not awarded. *See K.A.*, 710 F.3d at 105. Because the Court has found that Plaintiff is likely to succeed on the merits of its claim arising under the First Amendment, an analysis of the irreparable injury prong is fairly straightforward. To this end, the Supreme Court held in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373–74 (citing *N.Y. Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam)); *see also K.A.*, 710 F.3d at 113 (quoting same); *Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir. 2002) (quoting same). However, despite this broad pronouncement, the Court of Appeals has distinguished *Elrod* (at least in an non-precedential decision) and demanded some further proof of irreparable injury prior to issuing a preliminary injunction on First Amendment grounds. To

this end, in *Conchatta v. Evanko*, 83 F. App'x 437, 442-43 (3d Cir. 2003), the Court of Appeals affirmed the District Court's denial of an injunction although it commented that the plaintiff had made a "strong case" that the challenged statute was constitutionally overbroad. As the basis for this decision, the Court of Appeals pointed to the fact that the plaintiff had presented no evidence of economic harm (potential or otherwise) and also did not demonstrate that the law had ever been enforced against it or that it was ever threatened with enforcement. *Id.*

Here, unlike *Conchatta*, the challenged governmental action of terminating the parties' relationship has already taken place and the evidence of record has shown that there have been some direct effects on Plaintiff's operations on weekend evenings when the secondary employer services were previously procured. (Docket No. 22 at 22, 24, 29-30, 36, 50-1). It is true that Plaintiff has presented no evidence of economic harm as a result of its inability to hire off-duty officers to provide secondary employment services at its businesses on weekends since the decision to terminate its contract was made on March 13, 2013. (*Id.* at 37). Indeed, at the hearing, Bortz explained that March and April were strong months for his business and that it did very well financially during that time. (*Id.*). However, he also expressed that the loss of off-duty police services caused him to see an increase in aggressive panhandlers bothering his customers and he and Ms. West explained that they had a general sense of feeling less safe without the added level of security provided by a uniformed police officer during their busiest days and when closing the facility. (*Id.* at 24, 29-30, 50-1). They opined that their customers were similarly affected by the lack of a police presence. (*Id.* at 24, 30, 50-1). But, the record is also undisputed that there were no calls for police services emanating from Blush from March 13 until the hearing on April 25. (*Id.* at 67). In all, Bortz explained that the tangible effect of the loss of secondary employment services on his business was unknown after only six weeks. (*Id.*

at 30).

While the Court acknowledges that the parties presented conflicting evidence at the hearing concerning whether or not the secondary employment services are necessary to deter crime at Blush given the low amount of reported criminal incidents there, which were described as non-serious in nature, the evidence is sufficient to prove by a preponderance of the evidence that Plaintiff's First Amendment rights likely have been violated by government action that terminated its contractual relationship solely based on its engaging in protected activities. *See* § V.A.1, *supra*. As is noted above, retaliatory acts concerning even trivial or de mininis matters are actionable and the terminated secondary employment services in this case clearly surpass this low threshold. *See O'Connor*, 440 F.3d at 127-28. It is likewise undisputed that the Plaintiff simply cannot procure the type of services offered by the Bureau from any other entity. (Docket No. 22 at 181, 185). Thus, it has undoubtedly been irreparably harmed by the loss of the ability to participate in the Bureau's program since March 13, 2013. *See Elrod*, 427 U.S. at 373–74. The evaluation of Plaintiff's rights under the Pennsylvania Constitution and the Equal Protection Clause of the Fourteenth Amendment rely on a similar analysis and any further discussion of those claims would be purely academic in nature. As such, the Court finds that this factor weighs in favor of issuing a preliminary injunction.

### C. Balance of Harms

The Court's evaluation of the balance of harms between the parties if a preliminary injunction is issued enjoining the Defendants from terminating Blush's approved secondary employer status and prohibiting it from participating in the program also favors Plaintiff. *See K.A.*, 710 F.3d at 105. While the issuance of a preliminary injunction may in some fashion impinge on the significant or important interests of the Bureau and the Acting Chief in

controlling the off-duty work of police personnel at certain locations, prior to the termination of Blush's secondary employer status, the parties maintained a long-standing and mutually-beneficial commercial relationship for nearly five decades.  (Docket No. 22 at 17, 158, 188). Pursuant to this relationship, City police officers (including Officer McMullan and his father) have worked in a secondary employment capacity at Blush without any significant incidents and no reported policy violations.  (*Id.*).  Blush has timely paid the City for the secondary employer services provided by these officers and will undoubtedly continue to pay any such necessary fees when the relationship is reinvigorated on the prior terms of same.  (*Id.* at 86, 158-59).  Further, the officers working secondary employment details at Blush will remain subject to the oversight of the Bureau and the policies and procedures detailed in Order 29-1 much like officers working details at any other bar or restaurant throughout the City which participates in the program.  *See* Pl. Ex. 1.

The preliminary injunction likewise would not prevent the Bureau, Acting Chief, City Council members, the FOP and any other interested stakeholders from continuing their efforts to study the Secondary Employment Program and possibly make significant changes to the same, such as the pilot program in the South Side entertainment district which was described at the hearing.  *See Swartzwelder*, 297 F.3d at 242 ("While the preliminary injunction may impinge on significant interests of the City, the preliminary injunction leaves the City free to attempt to draft new regulations that are better tailored to serve those interests.").  However, under the preliminary injunction, Defendants will not be authorized to terminate Blush's previously approved secondary employer status for discriminatory reasons.  On the other hand, as the Court has already discussed at length, Plaintiff will be harmed if it cannot continue to participate in the program solely because its business involves protected activities.  Accordingly, the balancing of

the parties' interests favors Plaintiff.  *See K.A.*, 710 F.3d at 105.

### D.  Public Interest

The Court of Appeals recognizes that injunctive relief is in the public's interest when governmental action is likely to be declared unconstitutional "because the enforcement of an unconstitutional law vindicates no public interest."  *K.A.,* 710 F.3d at 114 (citing *ACLU v. Ashcroft,* 322 F.3d 240, 251 n. 11 (3d Cir. 2003)).  Likewise, the failure to intervene to enjoin the likely unconstitutional termination of Blush's contract is not in the interest of the public.  *See id.*  In addition, the public interest is arguably furthered by Blush's continued procurement of secondary employment services on 9th Street in the Cultural District, an area of the City where no other businesses are reportedly participating in the Secondary Employer Program.  (Docket No. 22 at 37-38).  It cannot be reasonably argued that the increased police presence in the Cultural District causes harm to the City when the officer's presence alone deters crime and protects members of the public and businesses in the surrounding area.  (*Id.* at 59-60).  In fact, Officer McMullan offered credible testimony that while working the detail, he has often assisted the surrounding businesses with criminal issues and even apprehended armed robbers who had committed crimes at another establishment.  (*Id.* at 61-62, 67, 72).  Further, these additional police services performed by Officer McMullan were all provided at the expense of Blush.  (*Id.* at 86).  Accordingly, this factor also weighs in favor of Plaintiff.  *See K.A.*, 710 F.3d at 105.

### E.  Conclusion

For all of these reasons, the Court will exercise its discretion and issue a preliminary injunction enjoining Defendants from terminating Blush's approved secondary employer status and prohibiting it from participating in the Secondary Employer Program.  *See id.*  As a final matter, Plaintiff argues that it should not be required to post a bond as is generally required under

Rule 65(c) of the Federal Rules of Civil Procedure should a preliminary injunction issue in its favor. *See* Fed. R. Civ. P. 65(c) ("“[t]he Court may issue a preliminary injunction ... only if the movant gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.”). Defendants have not specifically responded to these arguments. (Docket Nos. 8-9, 23-24). In any event, the United States Court of Appeals for the Third Circuit has recognized that a District Court may waive the requirement of the posting of a bond in certain circumstances, such as when the party against whom the injunction is placed will not sustain a monetary loss. *See Temple University v. White*, 941 F.2d 201 (3d Cir. 1991); *see also Instant Air Freight Co. v. C. F. Air Freight, Inc.*, 882 F.2d 797, 803-04, n.8 (3d Cir. 1989). Here, given that the effect of the Court's Order will return the parties to a position where Plaintiff will resume paying the City for secondary employment services rendered at the same rates charged to all participants in the Secondary Employer Program, and the lack of any opposition to the request to waive the bond, the Court agrees that the imposition of a bond is inappropriate and will waive the requirement, as unnecessary in this case. *See id.*

VI. CONCLUSION

Based on the foregoing, Plaintiff's Motion [3] is GRANTED. An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge


Date:   June 17, 2013

cc/ecf:  All counsel of record.